CASE NO. 24-1450

---

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

BRAINCHILD SURGICAL DEVICES LLC,

*Plaintiff and Appellant,*

v.

CPA GLOBAL LIMITED,

*Defendant and Appellee.*

---

On Appeal From the United States District Court
For the Eastern District of Virginia
Case No. 1:21-cv-00554-RDA-JFA

---

## OPENING BRIEF OF APPELLANT

---

Ryan Benjamin Abbott
Brown Neri Smith & Khan, LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
(310) 593-9890
ryan@bnsklaw.com

Robert Franklin Powers
McClanahan Powers, PLLC
3160 Fairview Park Drive, Ste. 410
Falls Church, VA 22042
(703) 520-1326
rpowers@mcplegal.com

*Attorneys for Appellant Brainchild Surgical Devices LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1450_      Caption: _Brainchild Surgical Devices, LLC v. CPA Global Limited_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Brainchild Surgical Devices, LLC, on behalf of themselves and those similarly situated_
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                              ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: __May 29, 2024__

Counsel for: Brainchild Surgical Devices, LLC

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ...................................................3

STATEMENT OF ISSUES .................................................................4

STATEMENT OF CASE .....................................................................4

   A.    Factual Background...................................................................4

     1.   Brainchild and CPA Enter into a Renewal Service Agreement..................4

     2.   CPA Sends Renewal Notices with New Terms and Conditions.................7

     3.   CPA Obfuscates and Inflates its Country and Funds Management Charges. 8

        a.   CPA Inflates its Hidden Country Charges................................................9

        b.   CPA Inflates Brainchild's Official and Country Charges through a Hidden Undisclosed Funds Management Charge. ........................................12

        c.   CPA Staff Concede the Funds Management Charge is Indefensible.....14

        d.   CPA Conceals its Funds Management Charge from Clients. ...............16

        e.   Brainchild Terminates the Agreements. ...............................................18

   B.    Procedural History...................................................................18

     1.   Brainchild Files a Putative Class Action Against CPA. ...........................18

     2.   The District Court Dismisses Brainchild's Claim for Fraud without Leave to Amend. ...................................................................................19

     3.   The District Court Grants CPA's Motion for Summary Judgment and Denies Brainchild's Motion. .........................................................19

        a.   Brainchild's Motion for Partial Summary Judgment. ...........................20

        b.   CPA's Motion for Summary Judgment................................................21

4.   The District Court Grants CPA's Motions to Exclude Brainchild's Experts................................................................................................22

SUMMARY OF ARGUMENT ...............................................................23

STANDARD OF REVIEW ......................................................................26

ARGUMENT ............................................................................................28

A.   The District Court Erred in Granting CPA's Motion for Summary Judgment and Denying Brainchild's Motion. .......................................28

  1.   The District Court's Interpretation of the Plain Language of the Contracts is Flawed. ...........................................................................29

    a.   The Terms of the Contracts Indicate that Country and Funds Management Charges are Pass-Through Costs. ...................................29

    b.   Country and Funds Management Charges Did Not Comport with the Language of the Contracts. .................................................................32

      i.   Country Charges were Inflated. ............................................33

      ii.   Funds Management Charges were Inflated.........................35

  2.   The Voluntary Payment Doctrine Does Not Apply.....................37

  3.   CPA Breached the Implied Covenant of Good Faith and Fair Dealing by Charging Hidden, Arbitrary, and Unfair Fees. .................................38

B.   The District Court Abused its Discretion in Granting CPA's Motion to Exclude Testimony of David A. Cass. ..................................................40

  1.   The District Court Erred in Finding Cass is Unqualified. .........40

  2.   The District Court Erred in Finding Cass's Opinion Contains Legal Conclusions ...........................................................................................45

C.   The District Court Abused its Discretion in Granting CPA's Motion to Disqualify John Keogh. ........................................................................47

  1.   The District Court Erred in Disqualifying Keogh......................47

    a.   CPA Had No Basis for Believing it had a Confidential Relationship with

Keogh...................................................................................49

    b.   CPA Failed to Demonstrate that any Confidential Information About this Case was Disclosed to Keogh.......................................................52

  2.   The District Court Erred in Finding that Keogh's Opinion is Based on Undisclosed Information.....................................................55

  3.   The District Court Erred in Finding Keogh's Opinion Contains Legal Conclusions ..........................................................57

 D.    The District Court Erred in Denying Brainchild Leave to Amend its Fraud Claim...............................................................57

CONCLUSION ............................................................59

STATEMENT REGARDING ORAL ARGUMENT ............................................61

## TABLE OF AUTHORITIES

Page(s)

Cases

*Atalla v. Abdul-Baki*,
  976 F.2d 189 (4th Cir. 1992) ...................................................................28

*Bear Brand Hosiery Co. v. Tights, Inc.*,
  605 F.2d 723 (4th Cir. 1979) ...................................................................28

*Belk, Inc. v. Meyer Corp., U.S.*,
  679 F.3d 146 (4th Cir. 2012) ............................................................ 43, 44

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
  214 F. Supp. 2d 530 (D. Md. 2002) .......................................................44

*Carlisle v. Allianz Life Ins. Co. of N. Am.*, No.,
  2:19CV565, 2021 WL 8445825 (E.D. Va. Nov. 15, 2021) ................................54

*Cent. Laundry, LLC v. Illinois Union Ins. Co*,
  578 F. Supp. 3d 781 (E.D. Va. 2022) ......................................................29

*Criterion Ins. Co. v. Fulgham*,
  247 S.E.2d 404 (Va. 1978) .......................................................................38

*D.R. Horton, Inc. v. Bd. of Supervisors for Cty. of Warren*,
  737 S.E.2d 886 (Va. 2013) .......................................................................37

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) ...................................................................26

*Davison v. Randall*,
  912 F.3d 666 (4th Cir. 2019) ...................................................................27

*Deere Constr., LLC v. Cemex Constr. Materials Fla., LLC*,
  198 F. Supp. 3d 1332 (S.D. Fla. 2016) ....................................................30

*Dover v. British Airways, PLLC (UK)*,
  12 CV 5567 (RJD)(CLP) (E.D.N.Y. Nov. 8, 2013) ..............................31

*Enomoto v. Space Adventures, Ltd.*,
  624 F. Supp. 2d 443 (E.D. Va. 2009) ......................................................39

*Freight Tracking Technologies, LLC v. Virginia International Gateway, Inc.*, No.,
  2:13CV708, 2015 WL 12602435 (E.D. Va. Feb. 11, 2015) ...............54

*Grant Thornton, LLP. v. F.D.I.C.*,
  297 F. Supp. 2d 880 (S.D. W. Va. 2004) .................................................48

*Hewlett-Packard Co. v. EMC Corp.*,
  330 F. Supp. 2d 1087 (N.D. Cal. 2004)...................................................49

*Jacobs*,
  780 F.3d ...................................................................................................26

*Koch Ref. Co. v. Jennifer L. Boudreau M/V*,
  85 F.3d 1178 (5th Cir. 1996) ....................................................... 47, 49

*Kopf v. Skyrm*,
  993 F.2d 374 (4th Cir. 1993) ..........................................................41

*Latman v. Costa Cruise Lines, N.V.*,
  758 So. 2d 699 (Fla. Dist. Ct. App. 2000)....................................... 30, 40

*Mayer v. Dell*,
  139 F.R.D. 1 (D.D.C. 1991) ......................................................... 48, 53

*Murray Energy Corp. v. McCarthy*,
  No. 5:14-CV-39, 2016 WL 3390517 (N.D.W. Va. June 17, 2016) ...................54

*Online Res. Corp. v. Lawlor*,
  285 Va. 40 (2013)......................................................................28

*Ostrzenski v. Seigel*,
  177 F.3d 245 (4th Cir. 1999) ....................................................... 58, 59

*Palmer v. Ozbek*,
  144 F.R.D. 66 (D. Md. 1992) ..........................................................54

*Puga v. RCX Solutions, Inc.*,
  922 F. 3d 285 (5th Cir. 2019) ........................................................41

*Rhodes v. E.I. Du Pont De Nemours & Co.*,
  558 F. Supp. 2d 660 (S.D.W. Va. 2008) ........................................... 49, 52

*Stoney Glen, LLC v. S. Bank & Tr. Co.*,
  944 F. Supp. 2d 460 (E.D. Va. 2013)..................................................39

*Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.*,
  No. 2:12CV546, 2014 WL 12597160 (E.D. Va. Jan. 23, 2014) ........................38

*Teachers' Ret. Sys. Of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ..........................................................59

*Tessier v. Plastic Surgery Specialists, Inc.*,
  731 F. Supp. 724 (E.D.Va.1990) ......................................................48

*TFOR LLC v. Virtustream, Inc.*,
  2017 WL 11505355 (E.D. Va. June 22, 2017)..........................................58

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
  878 F.2d 791 (4th Cir. 1989)....................................................... 41, 43

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ...................................................................26

*U.S. ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc.*,
  994 F. Supp. 244 (D.N.J. 1997) ................................................................... passim

*U.S. ex rel. Godfrey v. Kellogg, Brown & Root*, Inc.,
  No. 05-cv-1418, 2008 WL 9878351 (E.D. Va. Mar. 13, 2008) ......................... 58

*United States v. Barile*,
  286 F.3d 749 ........................................................................................................ 46

*United States v. Perkins*,
  470 F.3d 150 (4th Cir. 2006) .............................................................................. 46

*United States v. Salamanca*,
  244 F. Supp. 2d 1023 (D.S.D. 2003) ................................................................. 48

*United States v. Thomas*,
  490 F. App'x 514 (4th Cir. 2012) ................................................................. 46, 57

*US ex rel. Carter v. Halliburton Co.*,
  144 F. Supp. 3d 869 (E.D. Va. 2015) ................................................................. 57

*Variety Stores, Inc., v. Wal-Mart Stores, Inc.*,
  888 F.3d 651 (4th Cir. 2018) ......................................................................... 26, 27

*Wang Laboratories, Inc. v. Toshiba Corp.*,
  762 F. Supp. 1246 (E.D.Va. 1991) ..................................................................... 48

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) .............................................................................. 27

*Wheeler v. John Deere Co.*,
  935 F.2d 1090 (10th Cir. 1991) .......................................................................... 44

*Williams v. Consolvo*,
  237 Va. 608 (1989) ............................................................................................. 38

Statutes

28 U.S.C. § 1291 ...................................................................................................... 4
28 U.S.C. § 1332(d)(2) ............................................................................................ 3

Rules

Fed. R. App. P. 4(a)(2) ............................................................................................. 4
Fed. R. Civ. P. 12(b)(6) .......................................................................................... 19
Fed. R. Civ. P. 56(a) ............................................................................................... 26
Fed. R. of Evid. 702 ................................................................................................ 41

**INTRODUCTION**

Appellee CPA Global Limited ("CPA") systematically overcharges its customers, including Appellant Brainchild Surgical Devices, LLC ("Brainchild"), for patent renewal services. The evidence demonstrates that even CPA understands that its pricing is "deceitful," "byzantine," illogical, "ma[d]e up as we go along," and that CPA is "ripping customers off" by including hidden and arbitrary "Country Charges" and "Funds Management Charges" in its invoices.

While the parties' contracts do contemplate such charges in connection with certain patent renewals, the terms of those agreements also expressly define the scope and nature of these charges. Specifically, the agreements provide that the "Country Charge" must "relate[]" to specific, jurisdictional-related expenses that CPA incurs in connection with non-U.S. patent renewals, such as the cost of hiring a local agent to submit the renewal payment. Likewise, the "Funds Management Charge" was explicitly limited to costs associated with required currency exchanges.

Brainchild submitted reams of evidence showing that, notwithstanding this plain language, CPA included wildly inflated Country and Funds Management Charges in its invoices to Brainchild, far beyond the costs to which those charges were intended to relate — costs which CPA claims it does not even know. The

1

evidence further proved that CPA intentionally obfuscates its pricing to prevent customers from discovering this overcharging.

In the proceeding below, CPA did not shy away from the fact that it hid and inflated its Country and Funds Management Charges. Instead, it brazenly argued that the terms of its contracts effectively allow it to charge whatever it wants.

Contrary to the plain language of the contracts and basic tenets of contract law and civil procedure, the District Court granted CPA's motion for summary judgment (and denied Brainchild's cross-motion), endorsing CPA's position that it is free to rip off its customers with impunity. It is hornbook law, however, that summary judgment can only ever be granted on a breach of contract claim if the contract is reasonably susceptible to only *one* interpretation. *At a minimum*, Brainchild's proffered construction — i.e., that Country and Funds Management Charges must be tethered to contract language — is undeniably reasonable. Even if the District Court found CPA's interpretation also reasonable (itself an error), that does not mean CPA simply wins. Rather, in that event, the case must be sent to a jury to determine the mutual intent of the contracting parties.

But in this case, the District Court improperly installed itself as the factfinder, effectively replacing the jury by opting for CPA's interpretation over Brainchild's. This was reversible error.

Similarly, the District Court erred in its rigid and draconian application of *Daubert* to exclude both of Brainchild's experts for issues that at most go to credibility and weight.

Given the plain language and structure of the agreements, as well as the volumes of documents and testimony confirming CPA's arbitrary pricing, summary judgment should have been granted in Brainchild's favor. But certainly, considering the record, there is no basis for finding *as a matter of law* that CPA did *not* breach. The Court's order condones CPA's deceitful charging practices and its blatant disregard for its own agreements. The order must be reversed.

## JURISDICTIONAL STATEMENT

Brainchild brought this action on behalf of itself and a putative class. The District Court had jurisdiction pursuant to CAFA, 28 U.S.C. § 1332(d)(2), because Brainchild is from a different state than CPA, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of attorneys' fees, interest, and costs.

On April 17, 2024, the District Court granted CPA's motion for summary judgment and denied Brainchild's motion for summary judgment. The Court directed the Clerk of the Court to enter judgment in favor of CPA and against Brainchild, and to terminate the action.

Brainchild filed a timely notice of appeal on May 15, 2024. *See* Fed. R. App. P. 4(a)(2). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the District Court erred in granting CPA's Motion for Summary Judgment?

2.    Whether the District Court erred in denying Brainchild's Partial Motion for Summary Judgment?

3.    Whether the District Court erred in granting CPA's Motion to Exclude the Testimony of David A. Cass?

4.    Whether the District Court erred in granting CPA's Motion to Disqualify Expert Witness John Keogh, or, in the Alternative, Strike or Exclude His Testimony?

5.    Whether the District Court erred in dismissing Brainchild's fraud claim without leave to amend?

## STATEMENT OF CASE

### A. <u>Factual Background</u>

#### 1. **Brainchild and CPA Enter into a Renewal Service Agreement.**

Brainchild is a New York-based small business that develops medical devices patented domestically and abroad. JA000307. CPA provides, among

other things, global patent renewal services.  JA000313.

On April 24, 2019, Brainchild entered into a CPA-drafted Renewal Service Agreement ("RSA") pursuant to which CPA agreed to "handle the payment of [Brainchild's] patent and design renewal fees."  JA000313.  The RSA contains a section on Operating Procedures, and a section on Terms and Conditions of Supply of CPA Global Limited ("T&Cs"). JA000313-JA000321.

Section 4 of the RSA's Operating Procedures states that CPA "will charge [Brainchild] USD 200 for each renewal (the 'Service Charge')."  JA000314.  The nature and amount of the Service Charge were transparently, clearly, and prominently disclosed.  JA000314.

Section 5 of the T&Cs provides for certain additional "Charges."  First, Section 5.2 reiterates that CPA "will charge a Service Charge for the Services calculated at the rate quoted in this Agreement"— i.e., $200.  JA000317-000318. Section 5.3 of the T&Cs then provides:

> 5.3  You shall also pay as Charges to us an amount comprising our estimated charges, as at the time of a Renewal Notice, in respect of submissions to the relevant registries in each jurisdiction (**"Official Charge"**) which vary from time to time and, where applicable, a **Country Charge**, which is set out in a tariff (which may vary from time to time), a current copy of which is available upon request.

JA000318.

The Official Charge denotes monies paid by CPA to registrars for patent renewals, which amounts are publicly disclosed.  JA000256; JA000296-JA000297.

The Country Charge reflects that renewing in certain countries can involve particular costs.  For example, in "direct pay" jurisdictions like the United States or the European Patent Office (EPO), anyone, including CPA, can pay a registrar directly without additional charge (for instance, through an official patent office website).  JA000297-JA000298.  However, in "indirect pay" jurisdictions, CPA instead uses a local agent to pay a registrar.  JA000256-000257; JA000297-JA000298.  For these jurisdictions, CPA incurs third-party costs because it pays local agents to submit its payments.

The RSA does not disclose amounts invoiced as Country Charges.  JA000318.  CPA admits, however, that Country Charges are not intended to be a source of profit for CPA.  JA000202-JA000203.

Section 5.3 further provides that "[t]he Official Charge and/or the Country Charge may be subject to a charge for funds management in accordance with Clause 5.6."  JA000318.  Section 5.6, in turn, provides in relevant part:

> 5.6  If the Official Charge, Country Charge and/or other sums of money *require to be converted from one currency into the Currency*, such sums or Charges shall be calculated using our CPA Global rates which include provision for funds management e.g. currency exchange/risk exposure, managing global transactions, credit risk and the financing of renewals payments.

JA000318 (emphasis added).

6

The RSA does not disclose amounts invoiced as Funds Management

Charges.  JA000318.  CPA again concedes, however, that the Funds Management

Charge is also not intended to be a source of profit for CPA.  JA000203.

### 2.  CPA Sends Renewal Notices with New Terms and Conditions.

Subsequently, as Brainchild patents came up for renewal, CPA sent Renewal

Notices with new T&Cs that elaborated on, and purported to supersede, those of

the RSA.  JA000323-JA000324.

Section 5 of the Renewal Notices provides, in relevant part:

> 5.2 You shall also pay an Official Charge, which represents the amount we pay to relevant registries in each jurisdiction. This charge may vary from time to time and may be subject to a charge for funds management (as set out in section 5.4).
>
> 5.3 You shall, where required, also pay a Country Charge. This charge relates to the infrastructure, CPA Global personnel and third parties (where appropriate) required in order to execute a renewal in a particular jurisdiction and may be subject to a charge for funds management (as set out in section 5.4). CPA Global maintains a schedule of applicable Country Charges which may be updated from time to time, a current copy of which is available on request.
>
> 5.4 If the Official Charge, Country Charge and/or other sums of money require to be converted from one currency into the currency we have agreed with you as your "Account currency", such sums or Charges shall be calculated using our CPA Global rates which include provision for funds management e.g. currency exchange/risk exposure, managing global transactions, credit risk and the financing of renewals payments.
>
> 5.6 On each occasion upon which we send you a renewal notice in relation to the maintenance of a particular intellectual property

7

right we give you our best estimate of the likely total aggregate charges to be payable in respect thereof (including the Service Charge, the Country Charge and the Official Charge) on the basis that the transaction proceeds in an expected and standard manner.

JA000324.

### 3. CPA Obfuscates and Inflates its Country and Funds Management Charges.

Between February 28, 2019 and February 28, 2021, CPA sent Brainchild five invoices for non-US patents. JA000213-JA000228. No invoice explained how renewal charges were calculated or itemized component charges (e.g., Country or Funds Management Charges). Rather, invoices included only lump sums for each renewal. JA000213-JA000228. Similarly, while CPA sent "estimates" as required under Section 5.6, those again only contained lump sums with no breakdowns or explanations. JA000213-JA000228.

As revealed in discovery, CPA intentionally invoiced like this to obfuscate its Country and Funds Management Charges. JA001401-JA001402.





### a.  CPA Inflates its Hidden Country Charges.

The RSA provides that Country Charges represent certain jurisdiction-specific costs passed onto clients.  JA000318.  Similarly, the Renewal Notice explains that Country Charges "relate[] to the infrastructure, CPA Global personnel and third parties (where appropriate) ***required*** in order to execute a renewal in a particular jurisdiction. . . "  JA000324 (emphasis added).

Payments by CPA to local agents are not disputed here as a basis for Country Charges.  JA000297-000298.  ████████████████████████████

████████████████████████████  JA001392.

CPA has not identified any other third-party costs associated with Country Charges.

CPA argued that, in addition to external costs, Country Charges pay for internal costs of infrastructure and personnel. ████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████  JA001424-JA001429.  It has also never provided costs for these items in any deposition, interrogatory, or in any documents produced.

Every invoice and renewal notice for non-U.S. jurisdictions included Country Charges vastly more than CPA's jurisdictional costs.  JA001392.

For example, in a February 2019 invoice, CPA charged Brainchild $1,024.18 to renew a German patent.  JA000225.  Germany is a direct pay jurisdiction, meaning CPA directly made its payment without third party costs. JA001420; JA000296-JA000298.  Yet, CPA included a Country Charge of ████████ JA001392. ███████████████████████████████████████ ████████████████████████████████████████████████████  This was the case in every invoice CPA sent to Brainchild.  JA001392.

Internal CPA documents confirm its practice of covertly inflating Country Charges.  For example, ██████████████████████████████████ ███████████████████████████████████████████████████████████



JA001367.

JA001371 (emphasis added).

JA001131.

JA001179.

Moreover, a former CPA executive confirmed that

██████ JA001407-JA001408. ████████████████

██████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

Finally, while CPA never provided Brainchild with its Country Charges, the Agreement states that a "tariff" of Country Charges is available, but only upon request.  JA000318.  Unless a client specifically requests a tariff, they have no way to determine what CPA is charging for Country Charges.  JA000318; JA001430.



      **b. CPA Inflates Brainchild's Official and Country Charges through a Hidden, Undisclosed Funds Management Charge.**

CPA also included undisclosed Funds Management Charges in each
Brainchild renewal. JA001392; JA001110-JA001120. Only if currency is
"require[d] to be converted," the Funds Management Charge was supposed to
function as a markup on the Country and Official Charge to account for CPA's
costs related to "currency exchange/risk exposure, managing global transactions,
credit risk and the financing of renewals payments." JA000318; JA000324

During discovery, CPA admitted that its Funds Management Charge for
Brainchild is a █████████████████████████████████. JA001110-
JA001120; JA001392. For example, with respect to a European Patent Office
(EPO) renewal, CPA charged a lump sum total of $1,801.58. JA000217. During
this case, Brainchild discovered this includes an Official Charge of ████████ and a
Country Charge of ████████████████████ JA001101-JA001102;
JA001392. CPA then added ██████ *funds management markup* to both charges
██████████████████████ even though there was no currency conversion
associated with the Country Charge as there were no external costs. JA001101-
JA001102; JA001392; JA001420. ██████████████████████████

████████████████████████████████████████████████

████████████████

Until discovery, CPA never disclosed the ████ funds management markup to
Brainchild, and still has not explained specifically how it calculated ████ or what

13

its costs are related to funds management. JA000308.  CPA included similar Funds

Management Charges in each Brainchild invoice.  JA001110-JA001120;

JA001392.

Despite the Renewal Notice expressly stating that the Funds Management

Charge is intended to cover certain costs, ███████████████████████

████████████████████████████ JA001431-JA001432.  ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ JA001410-JA001411; JA001411 (emphasis

added).

### c. CPA Staff Concede the Funds Management Charge is Indefensible.

CPA's own staff expressed concern regarding its Funds Management

Charges.  In an internal survey, CPA representatives made the following remarks:



JA001129.





JA001291.

### d. CPA Conceals its Funds Management Charge from Clients.

CPA actively worked to hide its Funds Management Charges from clients.



JA001293.

Moreover ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ JA001409.

Similarly, ████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ JA001478-JA001479

(emphasis added).

Likewise, ███████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

██████████ JA001382-JA001383 (emphasis added).

At one point, in response to concerns about their transparency, ███

████████████████████████████████████████████████

███████████████████████████████████████████████



JA001330.

JA001330.  In other words, CPA recognized that it would not be competitive if its customers knew what they were actually paying.

JA001476.

### e.  Brainchild Terminates the Agreements.

Brainchild paid all CPA's invoices.  JA000308.  Around the time of the final payment, Brainchild began suspecting that CPA was overcharging, but did not have knowledge of all the facts regarding CPA's billing practices.  Brainchild ultimately terminated its agreements with CPA after onboarding another renewal provider.  JA000783-JA000784.

## B. <u>Procedural History</u>

### 1.  Brainchild Files a Putative Class Action Against CPA.

On May 2, 2021, Brainchild filed its complaint asserting causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud by concealment, unjust enrichment, and injunctive relief.

The District Court subsequently granted in part CPA's motion to dismiss. In relevant part, the Court dismissed Brainchild's implied covenant claim on the grounds that it was not a separate claim but could be pursued in connection with Brainchild's breach of contract claim. JA000076. The Court also dismissed without prejudice Brainchild's claim for fraud pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). JA000077-JA000079.

### 2. The District Court Dismisses Brainchild's Claim for Fraud without Leave to Amend.

On April 21, 2022, Brainchild filed its First Amended Class Action Complaint, asserting claims for breach of contract and fraud. JA000082-JA000101. With respect to its fraud claim, Brainchild alleged that CPA made specific material misrepresentations, at the direction of its CEO, regarding the nature and amounts of charges it would levy against Brainchild. CPA again moved to dismiss Brainchild's fraud claim pursuant to Rule 12(b)(6). The Court granted the motion and dismissed Brainchild's claim with prejudice and without leave to amend on the ground that such leave would be futile, notwithstanding Brainchild's request for leave to amend and representation that it could add additional, particularized allegations regarding CPA's fraudulent conduct. JA000113.

### 3. The District Court Grants CPA's Motion for Summary Judgment and Denies Brainchild's Motion.

On September 29, 2023, CPA moved for summary judgment.  Brainchild also filed its own motion for partial summary judgment on the issue of CPA's liability.

### a. Brainchild's Motion for Partial Summary Judgment.

At a high level, Brainchild's argument was that CPA breached the RSA and Renewal Notices by charging arbitrary, hidden, and inflated Country and Funds Management Charges.  More specifically, Brainchild argued first that, pursuant to the plain language of the contracts, these charges were intended only to pass through certain costs incurred by CPA in connection with renewing Brainchild's patents — they were not intended to be profit generators.

Brainchild separately argued that, even if the Country and Funds Management Charges were not "pass-through" charges and could properly include amounts intended to cover internal costs (including cost of risk) — or even act as profit centers for CPA — CPA is still bound by the terms of the RSA and Renewal Notices when setting the level of these charges.  Specifically, Brainchild argued that CPA's Country and Funds Management Charges are not "related" to the enumerated costs these charges were intended to account for, and, in fact, *cannot* be related to these costs because CPA concedes it does not even track them.

Finally, Brainchild argued that CPA breached the implied covenant of good faith and fair dealing by charging hidden, unfair, and arbitrary prices.

On April 17, the District Court denied Brainchild's motion, narrowly

focusing on Brainchild's first argument that these fees are strictly pass-through

charges. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ The Court did not address Brainchild's separate

argument that, even if these were not pass-through charges, the charges still fail to

comport with the language of the RSA and Renewal Notices because they are not

sufficiently related to the enumerated costs that the charges are intended to account

for.

### b.  CPA's Motion for Summary Judgment.

In its cross-motion for summary judgment, CPA argued that, because it sent

Brainchild estimates of the total aggregate renewal charges, and Brainchild

subsequently paid those renewal fees, that Brainchild agreed to pay exorbitant

hidden charges.  CPA further argued that the RSA "contains no specific terms at all

regarding how the Country Charge or the funds management charge were to be

calculated," and thus it could charge whatever it wanted (if it sent a lump-sum

estimate in advance).  Therefore, CPA argued that it did not breach the contracts

by overcharging.  Brainchild opposed CPA's motion on the ground that CPA's

interpretation of the plain language was wrong, and that, at a minimum, there are

ambiguities and triable issues of fact regarding what CPA was allowed to charge.

The Court granted CPA's motion, finding that the Country and Funds

Management Charges were not pass-through charges and that CPA did not violate

the implied covenant by concealing its prices or charging arbitrary, unfair prices.

JA002583-JA002587.  The Court also held that Brainchild was barred from

recovering its final invoice payment under the voluntary payment doctrine.

JA002587-JA002589.

### 4.  The District Court Grants CPA's Motions to Exclude Brainchild's Experts.

The District Court's April 17, 2024 order also granted CPA's motions to

exclude testimony from Brainchild's experts, Messrs. Cass and Keogh.  Brainchild

designated Cass as its expert to testify, among other things, as to the damages

suffered by Brainchild, as well as the usage and nature of pricing, costs and

contracts in international transactions.  Brainchild designated Keogh as its expert

to testify, among other things, as to the patent renewal process and industry, the

typical components of a country and funds management charge, and the general

costs associated with such charges.

The Court determined that Cass, despite his many years of experience in

financial services, was unqualified to offer any opinion because he was not a patent

renewal industry expert.  JA002564-JA002566.  The Court also found that Cass's

opinions that Brainchild was overcharged and his interpretation of country and

funds management charges were legal conclusions.  JA002566-JA002567.

The Court also excluded Keogh.  First, the Court disqualified him because

Keogh worked at CPA a decade ago.  The Court concluded that Keogh had a

confidential relationship with CPA and exposure to CPA's billing practices.

JA002568-JA002570.  Separately, the Court held that Keogh's opinions were

based in part on information he refused to disclose in his deposition — namely,

information regarding the confidential costs and pricing methods of

RenewalsDesk, a separate patent renewal provider for whom Keogh previously

worked.  JA002571-JA002575.  Finally, the Court determined that, like Cass,

Keogh's opinions regarding the customary usage and nature of country and funds

management charges in the patent renewal industry constituted legal conclusions.

JA002575.

## SUMMARY OF ARGUMENT

Respectfully, the District Court made multiple reversible errors.  First, the

Court erred in granting CPA's motion for summary judgment and denying

Brainchild's motion.  Specifically, the Court erred in ruling as a matter of law that

the Country and Funds Management Charges were not limited to pass-through

costs, in contravention of the plain language of the RSA and Renewal Notices.

And even if Country and Funds Management Charges could include internal costs and even act as profit generators, those charges must still be tethered to contract language, which provided that the charges must "relate" to specific costs. CPA, however, ███████████████████████████ arbitrarily charged whatever it believed a customer would pay. This conduct violated the express terms of the RSA and Renewal Notices, as well as the implied covenant of good faith and fair dealing.

*At a minimum*, Brainchild's interpretation of the agreements is reasonable, and the evidence adduced presents triable issues of fact regarding the meaning of the relevant contract provisions and whether CPA breached those provisions. The Court erred by simply picking CPA's interpretation.

The Court also misapplied the voluntary payment doctrine, as Brainchild did not pay its final invoice with full knowledge of the relevant facts regarding CPA's billing practices, and thus the doctrine is inapplicable.

Second, the District Court erred in granting CPA's motions to exclude Brainchild's experts/testimony. With respect to Cass, the Court erred in finding that he is unqualified. Cass has more than a decade of high-level experience handling international transactions, invoices, and contracts, including contracts with country and funds management charges. His experience provides him ample qualification to opine regarding the usage of such charges. Moreover, his body of

experience includes designing complex financial models, which enables him to opine as an expert on Brainchild's damages. Finally, contrary to the Court's ruling, Cass is not offering legal conclusions — rather, his testimony relates to how CPA charged Brainchild coupled with the meaning of specialized terms and how they are understood in an industry, concepts which a jury is unlikely to be familiar with, and which testimony is frequently allowed by Courts — particularly if contractual language is found ambiguous.

As for Keogh, the Court first erred in disqualifying him based on a purported conflict. Ten years ago, Keogh was an employee of CPA, but there is no evidence that CPA reasonably believed it had a confidential relationship with Keogh *with respect to this litigation*, nor is there evidence that CPA disclosed anything confidential to Keogh regarding this litigation. Moreover, the Court erred in finding that Keogh's opinions were in part based on information he refused to disclose regarding the pricing and costs of RenewalsDesk, a separate company. The information Keogh declined to give during his deposition had no bearing whatsoever on his opinions in this case, as Keogh himself made clear, so there could be no prejudice to CPA. This is borne out by the fact that the Court's order does not identify the actual testimony or portions of his report that are purportedly based on undisclosed RenewalsDesk costs. Finally, as with Cass, Keogh did not offer legal conclusions in his opinions—rather, Keogh, an expert in patent

renewals, offered helpful testimony regarding the usage and meaning of industry terms and how a reasonable patent renewal customer would understand those terms.

Finally, the Court also erred in dismissing Brainchild's fraud claim without leave to amend. Leave must be liberally granted, and Brainchild articulated the additional allegations it would include to state a claim.

## STANDARD OF REVIEW

This Court reviews grant or denial of summary judgment *de novo*. *Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013).

Under Fed. R. Civ. P. 56(a), a court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if a "reasonable jury could return a verdict for the non-moving party." *Variety Stores, Inc., v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citation omitted).

When considering a motion for summary judgment, the court "must 'view the evidence in the light most favorable to the' non-moving party." *Jacobs*, 780 F.3d at 568, *quoting Tolan v. Cotton*, 572 U.S. 650, 657 (2014), and "[s]ummary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Variety Stores*, 888 F.3d at 659. The court has "improperly weigh[ed] the evidence where it fails to credit evidence

contradicting the moving party's proposed factual conclusions, or where it fails to draw reasonable inferences, as it must, in the light most favorable to the non-moving party." *Variety Stores*, 888 F.3d at 659-60 (citations omitted).

The District Court's determinations with respect to the admissibility of proffered expert testimony is subject to review for abuse of discretion. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). A lower court abuses its discretion if it makes an error of law or a clearly erroneous factual finding. *Id*. The district court "abuses its discretion if its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Id*. (citation omitted). "[E]ven if a district court applies the correct legal principles to adequately supported facts, the discretion of the trial court is not boundless and subject to automatic affirmance." *Id*. The Court of Appeal must reverse if it has "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id*. (internal quotation marks omitted).

Finally, this Court also reviews *de novo* the District Court's decision to dismiss Brainchild's claim for fraud without leave to amend on grounds that such leave would be futile. *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019).

27

## ARGUMENT

### A. The District Court Erred in Granting CPA's Motion for Summary Judgment and Denying Brainchild's Motion.

"Only an unambiguous writing justifie[s] summary judgment, and no writing is unambiguous if susceptible of two reasonable interpretations." *Bear Brand Hosiery Co. v. Tights, Inc.*, 605 F.2d 723, 726 (4th Cir. 1979). Brainchild's proffered interpretation of the RSA and Renewal Notices — based on their structure and plain language and CPA's intentional obfuscation of its prices — is undeniably reasonable, and it was error for the Court to grant CPA summary judgment. In fact, Brainchild submits that its interpretation is the *only* reasonable one, and thus summary judgment should have been granted *in its favor*.

But at a minimum, even if the Court found CPA's proposed interpretation reasonable, then *both* parties' motions should have been denied and the case sent to the jury. *Atalla v. Abdul-Baki*, 976 F.2d 189, 193 (4th Cir. 1992) (reversing summary judgment grant because the "agreement around which this dispute revolves is capable of at least two plausible interpretations"); *Online Res. Corp. v. Lawlor*, 285 Va. 40, 54 (2013) ("[I]f reasonable people could draw different conclusions, the meaning of the contract upon the evidence presented should be submitted to the jury."). Instead, the District Court improperly supplanted the role of the jury by effectively choosing between competing constructions.

**1. The District Court's Interpretation of the Plain Language of the Contracts is Flawed.**

**a. The Terms of the Contracts Indicate that Country and Funds Management Charges are Pass-Through Costs.**

To start, the District Court erred in concluding *as a matter of law* that Country and Funds Management Charges should not be interpreted as pass-through charges from which CPA is not entitled to generate profit.

The RSA entitles CPA to charge Brainchild a $200 Service Charge for each renewal. JA000314. Based on how CPA itself framed its charges, Brainchild, as any reasonable client would, understood the Service Charge to be the amount CPA was receiving for its services (hence the title of the charge), and that $200 per renewal would include CPA's overhead with an additional margin for profit. This was the only charge specified by amount in the RSA. Conversely, the other charges in the T&Cs, including Country and Funds Management Charges, were intended only to cover specific, identified costs incurred by CPA. JA000314; JA000324. Indeed, CPA admits that these charges are not intended to generate profit for CPA. JA000202-JA000203.

This reading is bolstered by viewing the terms in the context of where they appear in the RSA and Renewal Notices. *Cent. Laundry, LLC v. Illinois Union Ins. Co*, 578 F. Supp. 3d 781, 790 (E.D. Va. 2022) (contracts must be read "as a whole

29

in order to squarely identify the intent of the parties at the time of contracting and ensure the various provisions are harmonized") (cleaned up).

An explanation of the Service Charge is in multiple places, including in Section 5.2 of the RSA terms and conditions. JA000318. Immediately after this description, Section 5.3 informs customers that there will be additional charges. First, an Official Charge, which is, as CPA does not dispute, purely a pass-through cost from patent offices. JA000318. Second, a Country Charge, "where applicable," with minimal context or description, except to state that the amount is contained in a "tariff" that is available "upon request." JA000318. This gives the impression that the charge is, like the Official Charge, a required and standardized pass-through cost. Indeed, even the name of the charge itself — "Country Charge" — indicates to any reasonable customer that this charge will be limited to jurisdiction-specific costs incurred by CPA (an understanding reinforced by use of the term "tariff"). *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. Dist. Ct. App. 2000) ("[T]he term 'port charges' . . . necessarily constitutes a representation to a reasonable consumer that these are 'pass-through' charges which the cruise line will pay to the relevant port authorities (and possibly others)."); *see also Deere Constr., LLC v. Cemex Constr. Materials Fla., LLC*, 198 F. Supp. 3d 1332, 1336 (S.D. Fla. 2016) ("By using the term 'fuel surcharge' in every invoice received by class members charged this fee, Defendants have

deceived Deere and members of the putative class into believing the fee is

calculated using Defendants' actual or increased fuel costs and that the fee will be

used to defray such costs."); *Dover v. British Airways, PLLC (UK)*, No. 12 CV

5567, 2013 WL 5970688, at *4 (E.D.N.Y. Nov. 8, 2013) ("[T]he typical consumer

would consider a fuel surcharge to be an added charge imposed . . . in order to

defray rising fuel costs.").

Similarly, the Funds Management Charge — an add-on to two other pass-

through charges (Official and Country Charges) — only applies in the context of

currency exchange and it is limited in the Renewal Notice to covering "currency

exchange/risk exposure, managing global transactions, credit risk and the financing

of renewals payments." JA000318; JA000324. Again, this plain language —

when read in conjunction with the Service Charge — provides that the Funds

Management Charge is intended to cover costs associated with required currency

exchange.

The framing of these charges was not accidental. CPA transparently

disclosed the Service Charge so that customers would focus on that number,

believing that other charges were external costs CPA was passing along like

Official Charges. Clients just looking at Service Charge would believe CPA was

providing a competitive price. But by discounting its Service Charge and secretly

shifting amounts to other charging components, CPA prevented clients such as

Brainchild from realizing what they were truly paying.  JA001330.

It is not disputed that CPA charged far more than its actual costs with

respect to Country and Funds Management Charges.  JA001410-JA001411;

JA001411 ██████████████████████████████████████████

████████████████████████████████████████████

████████ ; JA001371 ██████████████████████████████

████████████████ JA001129 ████████████████████████

████████████████████████████████████████████ ;

JA000797-JA000800 (Cass expert report); JA002253-JA002260 (Cass expert

report); JA000886-JA000888 (Keogh expert report); JA000896-JA000902 (Keogh

expert report).  For example, ████████████████████████████

██████████████████████████████████████████

██████████████████████████████ JA001442-JA001443.

Yet, CPA included a Funds Management Charge ████████████████████████

████████████████████████████████ .

### b. Country and Funds Management Charges Did Not Comport with the Language of the Contracts.

Critically, the District Court's order focused narrowly on whether Country

and Funds Management Charges are limited to pass-through costs.  But Brainchild

also argued below that, even if Country and Funds Management Charges properly

include internal costs or act as profit centers, the charges must still be tethered to

contract language.  Specifically, Country Charges must "relate[] to the

infrastructure, CPA Global personnel and third parties (where appropriate)

required in order to execute a renewal in a particular jurisdiction."  JA000324.

And Funds Management Charges must relate to "currency exchange/risk exposure,

managing global transactions, credit risk and the financing of renewals payments."

### i.    Country Charges were Inflated.



JA001392; JA001098-JA001120.  Even if the

Country Charges properly include certain internal CPA costs for infrastructure and

personnel, CPA has stated that

JA001424-JA001429.

In reality, CPA charges as much as

it thinks it can get away with.

JA001396

█████████████████████████ JA001407-JA001408 ████████████████

████████████████████████████████.

CPA's internal documents reveal the arbitrariness and excessiveness of its Country Charges. As detailed, these materials include:

- Internal emails regarding the excessive nature of Country Charges. *See*, *e.g.*, JA001371

- Documents revealing that CPA sales staff did not have ████████ ██████████████████████████████████ JA001131.

- Notes revealing that CPA "██████████████████████████ ████████████████████████████ JA001179.

The arbitrariness of CPA's charges is further corroborated by the fact that CPA intentionally obfuscates its pricing, allowing it to inflate invoices to unsuspecting customers like Brainchild — ████████████████████ ████████ JA001412-JA-001414; JA001418. Indeed, it was impossible for Brainchild to determine from the invoices how Country Charges were calculated. JA000899-JA000900. CPA's former executive vice president testified that ███ ████████████████████████████████████████████ ████████ JA0014090. And CPA's internal documents are rife with admissions that CPA purposefully tries to hide the basis on which it calculates charges and

what those charges are. *See*, *e.g.*, JA001418; JA001367-JA001368; JA001500-JA001501 ██████████████████████████████████████████

██████████████████████████████████████████████████).

Nothing in the record contradicts these facts, nor does CPA offer any explanation as to how it calculated Brainchild's Country Charges. Instead, CPA argued that neither the RSA nor the Renewal Notices "say anything about how [Country Charges] would be calculated or whether or not CPA Global could earn a 'profit' on the Country Charge," and thus it is free to charge any amount whatsoever.

CPA's interpretation, adopted by the District Court, is squarely at odds with the language of the Renewal Notices, which expressly provide that Country Charges must "relate[] to the infrastructure, CPA Global personnel and third parties (where appropriate) required in order to execute a renewal in a particular jurisdiction." JA000324.

### ii. Funds Management Charges were Inflated.

The plain language of the agreements expressly define the purpose and limitations of Funds Management Charges — "e.g. currency exchange/risk exposure, managing global transactions, credit risk and the financing of renewals payments," and only if money is "require[d] to be converted." JA000318; JA000324

CPA did not, in fact, tether its Funds Management Charges to any of these

costs. ████████████████████████████████████████████

████████████████████████████████████ its costs relating to "currency

exchange/risk exposure, managing global transactions, credit risk and the financing

of renewals payments." JA001431-001432; JA001433-JA001434 (objections

omitted).

Instead, ██████████████████████████████████

████████████████████████████████████████████████

████████████████████ JA001113-JA001114. CPA's own internal documents

confirm that its Funds Management Charges were ████████████████████

██████████████████████████████████████████

JA001129; JA001291.

Again, this obfuscation was intentional. JA001382-JA001383 ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ ; JA001233 ██████████████████████

██████████████████████ JA001409.

Moreover, CPA added Funds Management Charges, which the RSA and

Renewal Notices explicitly state only apply to currency conversions, to amounts

not actually involving any currency conversion. JA000299-JA000301; JA001392;

JA001110-JA001120.  For instance, CPA argues that it can assess Country

Charges for internal costs of infrastructure and personnel in direct pay

jurisdictions, but even if the contract allows this (it does not), there are no currency

conversions associated with these *internal* costs. Yet CPA increased *all*

Brainchild's Country Charges by an ██████████ nearly all of which involved

direct pay jurisdictions.

Ultimately, the RSA and Renewal Notices do not allow, and no customer

would expect, ████████████████████████████████

████████████  Yet that is precisely how CPA uses this arbitrary charge.

JA001463.

### 2.  The Voluntary Payment Doctrine Does Not Apply.

Separately, the District Court erred by concluding Brainchild is barred from

recovering its final payment under the voluntary payment doctrine.  This doctrine

provides that "[w]here a party pays an illegal demand with ***full knowledge of all***

***the facts*** which render such demand illegal, . . . such payment must be deemed

voluntary, and cannot be recovered back.  *D.R. Horton, Inc. v. Bd. of Supervisors*

*for Cty. of Warren*, 737 S.E.2d 886, 888 (Va. 2013) (emphasis added).

First, there are triable issues of fact as to whether Brainchild had "full

knowledge of all the facts" regarding CPA's overbilling. Indeed, CPA submitted

no (let alone undisputed) evidence that Brainchild had "full knowledge" of CPA's

excessive charges until after paying its final invoice, investigating, and consulting with counsel.  JA000614-JA000616.

In any event, courts in Virgina have "refused to 'blindly apply the doctrine . . . when it means reaching a wholly inequitable result.'" *Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.*, No. 2:12CV546, 2014 WL 12597160, at *3 (E.D. Va. Jan. 23, 2014), *quoting Criterion Ins. Co. v. Fulgham*, 247 S.E.2d 404, 408 (Va. 1978). "Instead, the reasons underlying the rule should be examined, and when the reasons do not support its application, the rule will not be employed." *Id*. at 407. Specifically, the doctrine should not be applied if the defendant "would be unjustly enriched if allowed to keep the money." *Williams v. Consolvo*, 237 Va. 608, 614 (1989).

Here, that is precisely what will happen if the doctrine is employed.  If CPA breached the RSA and Renewal Notices, it would make no sense to allow CPA to retain the last of its ill-gotten gains.  *See Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.*, No. 2:12CV546, 2014 WL 12597160, at *4 (E.D. Va. Jan. 23, 2014) (refusing to employ the voluntary payment doctrine "[b]ecause it would be inequitable").

### 3. CPA Breached the Implied Covenant of Good Faith and Fair Dealing by Charging Hidden, Arbitrary, and Unfair Fees.

"In Virginia, every contract contains an implied covenant of good faith and fair dealing." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). The implied covenant prohibits a party from exercising its contractual rights "dishonestly," and provides that a party to a contract "cannot act arbitrarily or unfairly." *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013).

Here, CPA dishonestly concealed its pricing methodology and charged arbitrary and unfair amounts. Even CPA's own employees recognize that CPA is

███████████████████████████████████████████████████

██████████████ JA001129; JA001291.

The District Court, however, incorrectly held that CPA did not breach the implied covenant because CPA provided an "estimate of the total aggregate Charges" to Brainchild prior to sending invoices. JA002586-JA002587. But these estimates intentionally did not identify the Country or Funds Management Charges included in the totals. The mere fact that Brainchild unknowingly paid excessive charges does not absolve CPA. As the Court explained in *Latman*:

> Suppose that a company systematically overcharges its customers on sales tax. The hypothetical company pays the state the sales tax that it owes, and then keeps the overcharge for itself. . . . We would not hesitate to say that an intentional overcharge of sales tax, which is kept by the company itself, is an unfair and deceptive trade practice and that the consumer must be repaid. ***That is so even though the consumers clearly were willing to pay the price charged — in the hypothetical example, they actually paid the sales tax overcharges — nor would it***

*make a difference that the consumers paid no attention to the sales tax amount*."

758 So. 2d at 703 (Fla. Dist. Ct. App. 2000).  A contrary holding would effectively allow secret overcharging with impunity.

The District Court further erroneously held that ████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████

████████████████████████████████

**B.** **The District Court Abused its Discretion in Granting CPA's Motion to Exclude Testimony of David A. Cass.**

**1. The District Court Erred in Finding Cass is Unqualified.**

Brainchild designated Cass as an expert to testify as to CPA's Country and Funds Management Charges, the amounts CPA overcharged its customers, and the damages suffered by those customers.  JA000794-JA000800; JA2236-JA002260.

Cass's extensive relevant experience and knowledge provide him ample qualifications to offer these opinions.

"[R]ejection of expert testimony is the exception rather than the rule." *Puga v. RCX Solutions, Inc.*, 922 F. 3d 285, 294 (5th Cir. 2019). Under Federal Rule of Evidence 702, a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The witness' qualifications to render an expert opinion are [] liberally judged by Rule's702." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).

Where, as here, "the expert's qualifications are challenged, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Id*. "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).

Cass has over fifteen years of experience in financial services as a banking executive and a former regulator for the Federal Reserve Bank of New York Supervision Group. JA000794; JA000802-JA000808. His background includes enterprise management, governance, digital assets, regulatory compliance, cybersecurity, privacy, risk assessment, risk management, business continuity, and

disaster recovery.  JA000794; JA000802-JA000808.  With respect to risk

management, his experience includes credit, capital, international transactions, and

technical risk.  JA000794; JA000802-JA000808.  In addition, he has experience in

financial modeling in a variety of financial services industries and contexts, which

has included building, reviewing, and managing the construction of complex

models critical for business operations, strategic planning, budgeting, and

forecasting.  JA000868.

He experience also includes "analyzing and approving invoices and

contracting with service providers, including contracts that have involved payment

of country and funds management charges like those in CPA's contracts."

JA000868.  He further has experience in filing and maintaining business

registrations and licenses for numerous organizations, including in foreign

jurisdictions where his employers did business.  JA000868.

The District Court did not address any of Cass's actual experience in finding

him unqualified.  Instead, the Court fixated on the undisputed fact that Cass is not

an expert specifically in the patent renewal industry.  JA002564.  ***But Brainchild is***

***not offering Cass as an expert on patent renewals*** — rather, his reports relate to

costs, charges, and damages, which "are not things that are unique to patent

renewal."  JA001669-JA001670.  Rather, "it is common for funds management

fees to be associated with contracts in which currency conversions are

42

contemplated" in any industry, and "Country Fees and Funds Management charges were a component of" countless contracts Cass has reviewed and executed in his professional roles.  JA000872.

The Court's unduly narrow reading of Cass's qualifications — and its suggestion that only someone with patent renewal experience could testify as to country charges, funds management charges, and related damages — is clear error. The Court was required to "consider the proposed expert's full range of experience and training."  *Belk, Inc. v. Meyer Corp., U.S.,* 679 F.3d 146, 162 (4th Cir. 2012). And, importantly, an expert on "a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion."  *Thomas J. Kline*, 878 F.2d at 799.

The *Belk* case is instructive.  There, the plaintiff in a trade dress lawsuit unsuccessfully sought to exclude the consumer survey prepared by the defendant's expert on the ground that the expert had never done a survey in connection with trade dress claims before.  *Belk*, 679 F.3d at 162.  The Court held that "the fact that Didow had not previously conducted, specifically, trade dress or trademark surveys does not mean he was not properly qualified as an expert in this case," as the defendant "provide[d] no support for its argument that consumer survey research in trade dress litigation is *sui generis* such that an expert's lack of experience in

43

designing these specific surveys necessarily disqualifies him from giving an expert opinion." *Id*.

The same is true here. Neither CPA nor the District Court point to any support for the idea that country or funds management charges — which Cass testified are common in international trade — are somehow so unique in the patent renewal context that only someone with patent renewal expertise can opine on them. Indeed, CPA's own economic expert is also not a patent industry expert. Such a narrow rule would make it nearly impossible to find a damages expert in any case, as such experts are typically not also industry experts.

To the extent that CPA wishes to try to discredit Cass based on a lack of patent renewal experience, it is free to do so on cross-examination, but this is not a proper basis for excluding his testimony. *Belk*, 679 F.3d at 162 (concerns about expert's lack of specific experience were not grounds for exclusion but "were instead appropriately addressed during cross-examination"); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) ("[A] lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight.").

Ultimately, this is not a case in which Cass has only "general business expertise" *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 536 (D. Md. 2002). Rather, the analysis Cass performed is the precise analysis in which he has 15 years of experience — i.e., reviewing invoices, analyzing country and funds

44

management charges, and performing financial analysis and modeling. He has sufficient experience and knowledge regarding the issues on which he has been asked to opine.

**2. The District Court Erred in Finding Cass's Opinion Contains Legal Conclusions**

The District Court further abused its discretion by concluding that certain unspecified portions of Cass's opinions should be excluded on the ground that they constitute legal conclusions. Not only is the District Court's order unduly vague, it is also wrong.

As a threshold matter, while the District Court stated that it will "exclude several portions of Mr. Cass' opinions for the . . . reason that they are conclusions of law reserved for the Court," the Court never identifies the specific statements or opinions actually excluded. JA002567. The actual effect of the order is thus entirely unclear and must be reversed.

In any event, none of Cass's opinions constitute improper legal conclusions. The District Court seemed primarily concerned with statements from Cass in which he opined that CPA overcharged Brainchild based on how Brainchild was charged coupled with his understanding of the underlying agreements including the terms "Country Charge" and "Funds Management Charge". JA002566-JA002567. Cass, as a professional with more than a decade of experience

45

reviewing similar invoices and contracts containing country and funds management charges, is offering his expert opinion regarding what a reasonable client would understand such charges to typically encompass in similar transactions and how CPA charged related to that understanding. In other words, Cass is not opining that CPA breached the contracts; he is opining that CPA charged more in Country and Funds Management Charges than reasonable customer would understand those items to encompass.

Such testimony will aid the jury in its understanding of complex financial terms and its ultimate determination of whether CPA breached the RSA and Renewal Notices by inflating Country and Funds Management Charges. *See United States v. Perkins*, 470 F.3d 150, 157 (4th Cir. 2006) ("The touchstone of admissibility of testimony that goes to the ultimate issue, then, is helpfulness to the jury."). Such testimony is particularly relevant if contractual language is found to be ambiguous.

Indeed, courts routinely admit similar expert testimony. *See*, *e.g.*, *United States v. Thomas*, 490 F. App'x 514, 520–21 (4th Cir. 2012) ("When experts can support their testimony with relevant experience, courts generally allow them to testify regarding industry custom and usage when that explanation would provide the jury with helpful information."); *United States v. Barile*, 286 F.3d 749, 759 n. 7 (4th Cir. 2002) ("[I]n some circumstances, opinion testimony that arguably states a

46

legal conclusion is helpful to the jury, and thus, admissible.") (citations and quotation marks omitted).

The opinions Cass is offering here — i.e., the typical nature of country and funds management charges in transactions with international elements — are precisely the sort of helpful explanations of specialized financial terms that a jury would benefit from hearing.

## C. **The District Court Abused its Discretion in Granting CPA's Motion to Disqualify John Keogh.**

### 1. The District Court Erred in Disqualifying Keogh.

To start, the District Court abused its discretion when it determined Keogh should be disqualified pursuant to a supposed conflict based on prior CPA employment. Specifically, the Court essentially ignored the fact that the pertinent case law on expert disqualification focuses on whether the expert and the moving party had a confidential relationship *with respect to the instant litigation*, and whether confidential information was disclosed to the expert *about the instant litigation*, which is clearly not the case here.

"Federal courts have the inherent power to disqualify experts, although ***cases that grant disqualification are rare***." *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996) (emphasis added). Indeed, "[d]isqualification is a drastic measure which courts should hesitate to impose except when absolutely

47

necessary." *United States v. Salamanca*, 244 F. Supp. 2d 1023, 1025 (D.S.D.

2003).  Accordingly, "[a] party moving for disqualification bears a 'high standard

of proof' to show that disqualification is warranted." *Grant Thornton, LLP. v.

F.D.I.C.*, 297 F. Supp. 2d 880, 882 (S.D. W. Va. 2004), *quoting Tessier v. Plastic

Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D.Va.1990).

Courts utilize a two-step inquiry to determine whether a case presents the

"rare" instance in which an expert should be disqualified: "First, was it objectively

reasonable for the [moving] party . . . to conclude that a confidential relationship

existed?  Second, was any confidential or privileged information disclosed by the

[moving] party to the consultant?" *Wang Laboratories, Inc. v. Toshiba Corp*., 762

F. Supp. 1246, 1248 (E.D. Va. 1991) (citation omitted). "If the answers to both

inquiries are affirmative, then disqualification is compelled; if, on the other hand,

the answer to either inquiry is negative, disqualification may not be warranted. […]

The party seeking disqualification bears the burden of establishing both the

existence of a privilege and its non-waiver." *Mayer v. Dell*, 139 F.R.D. 1, 3

(D.D.C. 1991) (citations omitted).

Here, CPA fell far short of meeting its high standard of proof on either

factor.  Neither the Court nor CPA point to any precedent allowing for

disqualification when the expert was never an attorney or expert for the moving

party, received no confidential information from the moving party *related to the*

*case at hand*, and was disqualified simply because he had knowledge about the company's operations.

### a. CPA Had No Basis for Believing it had a Confidential Relationship with Keogh.

The first prong focuses on whether CPA reasonably assumed that a confidential relationship existed. *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660, 667 (S.D.W. Va. 2008). When evaluating this reasonableness, courts often consider: "whether the relationship was one of long standing and involved frequent contacts; whether the expert is to be called as a witness in the underlying case, whether the moving party funded or directed the formation of the opinion; whether the parties entered into a formal confidentiality agreement; whether the expert was retained to assist in the litigation; whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee; and whether the expert derived any of his specific ideas from work done under the direction of the retaining party." *Id*. (*quoting Hewlett-Packard Co. v. EMC Corp*., 330 F. Supp. 2d 1087, 1093 (N.D. Cal. 2004) and cleaned up).

As these factors make clear, this prong does not look simply at whether CPA believed Keogh had access to confidential information. Rather, the inquiry is whether CPA believed it had a confidential relationship with Keogh *as to this litigation*. *See Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1182

49

(5th Cir. 1996) (confidential relationship existed because the moving party previously "paid [the expert] $8000 and had received several written reports from him" regarding the subject matter of the litigation); *U.S. ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 250 (D.N.J. 1997) ("[T]he court finds that a professional relationship was established between HRS and Heffler such that it was objectively reasonable for HRS to assume that any confidential communications *relating to its litigation with CHCC* would be maintained in confidence.") (emphasis added).

With respect to this litigation, CPA and Keogh have *no* relationship, let alone a confidential one. Keogh left CPA eight years prior to Brainchild filing suit; there were no long standing or frequent contacts between Keogh and CPA; CPA did not fund or direct the formation of his opinions; there is no confidentiality agreement between Keogh and CPA with respect to this case (or otherwise); and none of Keogh's opinions are based in any way on any privileged information (and he testified he was not aware of receiving any privileged information). JA000910-JA000912.

The District Court, however, did not review any of these factors, nor did it recognize that the pertinent question is whether CPA and Keogh had a confidential relationship *as to this specific lawsuit*. Instead, the Court erroneously concluded that CPA met its burden of proof because, from 2005 to 2014, Keogh's job title at

CPA was "patent and trademark attorney," he had "comprehensive exposure to CPA's renewal practices," and that Keogh testified that he participated in "internal discussions" that were not shared with clients. JA002568-JA002570.

These facts are beside the point. For one, Keogh has never been a lawyer. JA001854-JA001855. While he is a "patent and trademark attorney," that is a foreign term of art that refers to professionals only qualified to do patent and trademark prosecution. Keogh's role was to provide guidance to CPA on how to make payments to and interact with patent offices. JA000911. He certainly did not provide CPA with confidential legal advice or work product relating to this lawsuit. JA000910-JA000912. And none of his opinions are based on any privileged information.

Moreover, the proper inquiry is not whether Keogh had "exposure" to CPA's confidential business practices. Rather, it is whether CPA reasonably believed it had a confidential relationship with Keogh such that it could disclose things to him *about this lawsuit*. *Cherry Hill*, 994 F. Supp. at 251 (distinguishing between a general confidential business relationship and a confidential relationship "pertaining to litigation"). Obviously, given that Keogh left CPA a decade ago, CPA could not reasonably have assumed as much, and the fact that Keogh admitted that he was exposed to CPA's business practices and was privy to general

internal discussions that were not disclosed to clients is a far cry from the showing required to meet the heavy burden to disqualify an expert.

> **b. CPA Failed to Demonstrate that any Confidential Information About this Case was Disclosed to Keogh.**

CPA also failed to meet its burden as to the second prong. This prong looks to whether the moving party actually disclosed confidential information to the expert about the specific case at hand. *Cherry Hill*, 994 F. Supp. at 250 (second prong relates to whether the expert received "confidential information relating to this specific litigation"). But not just any "confidential" information will do. Rather, as the *Rhodes* court explained:

> In the specific context of expert disqualification, confidential information essentially is information of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege. Confidential information in this context includes, among other things: discussions of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses. The confidential information must also be sufficiently related to the instant litigation to merit disqualification.

*Rhodes*, 558 F. Supp. 2d at 667 (citations and quotation marks omitted, and cleaned up).

Here, the District Court erroneously concluded that, because Keogh received information about CPA's pricing and renewal practices, and because those issues

52

underlie Brainchild's claims here, Keogh should be disqualified.  JA002570.  But the Court failed entirely to recognize the distinction between the disclosure of confidential *litigation* information (which supports disqualification) from the disclosure of confidential *business* information (which does not).  Here, the Court's disqualification is based entirely on the latter category, as neither the Court nor CPA identified any confidential litigation information — such as litigation strategies, claims or defense analysis, anticipated witness testimony, etc. — that CPA disclosed to Keogh.  *Mayer*, 139 F.R.D. at 4.

The *Cherry Hill* court framed how this analysis should occur, and its discussion highlights the deficiencies in the District Court's findings.  In *Cherry Hill*, the defendant argued that an accounting firm retained by the plaintiff "should be disqualified because its personnel were privy to information relevant to this litigation," such as "billing and reimbursement data." *Cherry Hill*, 994 F. Supp. at 250-51.  The court rejected the disqualification motion, explaining that there is a "distinction between confidential business and financial records and confidential communications related to a particular litigation," and only the latter warrants disqualification.  *Id*.  Indeed, the court "accept[ed] the argument that [the expert] must have been privy to business and financial information of [the defendant] . . . which may be relevant to this litigation," but reiterated that ***"[c]onfidential business information . . . may be distinguished from confidential***

53

*communications or documents pertaining to litigation*," and because "defendants have not submitted any evidence to the court to suggest that such confidences were ever exchanged between [the defendant] and [the expert]" the court correctly denied the defendant's motion. *Id.*

Other district courts are in accord with *Cherry Hill*. *See Palmer v. Ozbek*, 144 F.R.D. 66, 68 (D. Md. 1992) (denying motion to disqualify defendant's expert because "[n]o confidences or trial strategies were disclosed" to the expert); *see also Murray Energy Corp. v. McCarthy*, No. 5:14-CV-39, 2016 WL 3390517, at *4 (N.D.W. Va. June 17, 2016) (rejecting the EPA's motion to disqualify an expert who ten years earlier had worked for the EPA, as the EPA failed to identify confidential, privileged litigation information disclosed to the expert); *Carlisle v. Allianz Life Ins. Co. of N. Am.*, No. 2:19CV565, 2021 WL 8445825, at *3 (E.D. Va. Nov. 15, 2021) (affirming denial of a motion to disqualify where the moving party "failed to establish that the disclosed information from [the expert's] prior relationship . . . constituted privileged or confidential information in the context of the instant case"); *Freight Tracking Technologies, LLC v. Virginia International Gateway, Inc.*, No. 2:13CV708, 2015 WL 12602435, at *5 (E.D. Va. Feb. 11, 2015) (denying motion to disqualify because "there is no evidence that the flow of information, discussion, and presentation between [the expert] and [moving party] involved litigation or litigation strategy of any sort").

## 2. The District Court Erred in Finding that Keogh's Opinion is Based on Undisclosed Information.

The District Court also abused its discretion by purporting to strike certain, unspecified portions of Keogh's expert reports and declarations.  Specifically, the Court held that ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████    JA002574-JA002575.

As a threshold matter, as with the order excluding certain of Cass's opinions, it is unclear what, if anything, the District Court actually struck, and from which documents.  It is Brainchild's position — and Keogh's express testimony — that *none* of his opinions are "derive[d] from RenewalsDesk's pricing practices." JA000909-JA000910.  Rather, they are derived from his extensive knowledge of the patent industry.  JA000908.  Thus, nothing should be stricken, and the Court's order is a nullity.

In any event, the Court also committed clear error by attributing to Keogh an opinion he never gave, and then using that unexpressed opinion as the basis for its order.  Specifically, the Court mistakenly read Keogh's reports as opining that CPA's Funds Management Charge is excessive because it is higher than

RenewalsDesk's — an opinion Keogh simply did not give.  In fact, he testified to

precisely the opposite in his deposition. JA002191-JA002192; JA000909.

In opining that CPA's charges are excessive, Keogh once notes that

RenewalsDesk charges a flat 5% funds management charge, which is a general,

non-confidential item of industry knowledge that Keogh uses as just one data

point.  JA000909.  But Keogh never stated that CPA's prices should match

RenewalsDesk's prices, and in fact *he explicitly disclaimed such an opinion*

*during his deposition*.  JA000909.  He also made clear that he does not know

CPA's actual costs and that it is possible that CPA could justifiably charge more

than 5%.  JA002193-JA002194.  Instead, Keogh's opinions are based on his

extensive knowledge of how the patent renewal industry works and the general

costs associated with renewals.  JA002186-JA002187.

Yet, the Court's order incorrectly describes Keogh's opinion as being that

██████████████████████████████████████████████

███████████████████████████████  JA002572.  Based on this

misunderstanding, the Court then proceeded to find that Keogh's refusal to

disclose RenewalsDesk's specific costs requires that certain (unspecified) portions

of Keogh's opinion be stricken.

But neither CPA nor the District Court identify any actual opinion of Keogh

that is derived from information Keogh declined to disclose — a point highlighted

by the fact that the Court did not identify what portions of Keogh's opinions should be stricken.

### 3. The District Court Erred in Finding Keogh's Opinion Contains Legal Conclusions

Finally, the District Court abused its discretion in finding that certain (again unspecified) portions of Keogh's reports should be stricken as improper legal conclusions. JA002575. The Court's reasoning here mirrors its earlier discussion regarding Cass and is flawed and reversible for the same reasons — namely, Keogh's testimony regarding industry usage of country and funds management charges are not legal conclusions, but rather helpful explanations of industry terms and what a reasonable consumer would understand these charges to encompass. *See, e.g., Thomas*, 490 F. App'x at 520–21.

### D. The District Court Erred in Denying Brainchild Leave to Amend its Fraud Claim.

Finally, the District Court erred in refusing to grant Brainchild a second opportunity to amend its claim for fraud on grounds of purported futility. JA000113.

Leave to amend must be granted freely, even where a plaintiff has already amended once, as a party is entitled to amend its complaint as justice requires. *US ex rel. Carter v. Halliburton Co.*, 144 F. Supp. 3d 869, 878 (E.D. Va. 2015).

Indeed, the rules "require[] that plaintiff ***be given every opportunity*** to cure a formal defect in his pleading." *Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999) (emphasis added).

Courts routinely allow more than two opportunities for a plaintiff to plead a claim in situations where, as here, the complaint is found only to lack facts, as opposed to pursuing a futile legal theory. *See U.S. ex rel. Godfrey v. Kellogg, Brown & Root*, Inc., No. 05-cv-1418, 2008 WL 9878351, at *9 (E.D. Va. Mar. 13, 2008) (allowing plaintiff three opportunities to plead before determining that further amendment would be futile); *TFOR LLC v. Virtustream, Inc.*, 2017 WL 11505355 (E.D. Va. June 22, 2017) (claims for breach of contract and fraud in the inducement dismissed without prejudice allowing filing of Second Amended Complaint).

In fact, the Court recognized that "Plaintiff's allegations that Defendant made pre-contractual misrepresentations and omissions to induce Plaintiff and other members of the class to enter into renewal service agreements were actionable as fraud under the *general* pleading standard." JA000107. The Court found only that Brainchild had not alleged *particularized* facts as required under Rule 9(b), erroneously finding that Brainchild had not alleged which facts CPA concealed, who concealed them, and the way they were concealed.

In its opposition, Brainchild requested leave to amend, noting that, if necessary, it could further plead facts directly addressing the purportedly missing allegations. Specifically, and as the Court recognized, Brainchild proposed to identify which CPA principals communicated the misrepresentations to Brainchild, the approximate date of such communications, and how CPA initially communicated the misrepresentations. JA000113. Subsequent discovery has confirmed that Brainchild's claim for fraud is meritorious, as CPA's own employees concede that the company is ███████████████████████████ ███████████████ JA001129. This is textbook fraudulent inducement, and Brainchild should have been offered additional opportunity to cure the purported defects in its First Amended Complaint. *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 170 (4th Cir. 2007) ("[C]onsideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery.")

Ultimately, the District Court did not give Brainchild "every opportunity to cure" the purported defects in its claim. *Ostrzenski*, 177 F.3d at 252–53.

## CONCLUSION

Brainchild respectfully submits that the District Court made several prejudicial and reversible errors, all of which this Court should undo.

Respectfully Submitted,

<u>/s/ Ryan Benjamin Abbott</u>
Ryan Benjamin Abbott
Brown Neri Smith & Khan, LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
(310) 593-9890
ryan@bnsklaw.com

*Attorneys for Appellant Brainchild Surgical Devices LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Brainchild respectfully requests oral argument on this appeal and submits that, given the multiple issues and orders involved in this appeal, such argument would be helpful.

Respectfully Submitted,

/s/ Ryan Benjamin Abbott
Ryan Benjamin Abbott
Brown Neri Smith & Khan, LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
(310) 593-9890
ryan@bnsklaw.com

*Attorneys for Appellant Brainchild Surgical Devices LLC*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __24-1450__          **Caption:** Brainchild Surgical Devices, LLC v. CPA Global Limited

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___12,636___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Times New Roman, size 14 font _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Ryan Abbott _____

Party Name Brainchild Surgical Devices, LLC _____

Dated: July 9, 2024 _____